UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
-------------------------------------------------------------X
SEO DEVELOPMENT, LLC, ANN ANDERSON,
and EDWIN XAVIER VICIOSO,                                             Case No. 3:18-cv-05849

                                                                     **COMPLAINT**

                                    Plaintiffs,                      **Jury Trial Demanded**

              v.

GORDON THOMAS HONEYWELL, LLP, RYAN
ESPEGARD, and LEE OWENS,

                                    Defendants.
-------------------------------------------------------------X

        SEO Development, LLC ("SEO"), Ann Anderson, and Edwin Xavier Vicioso (collectively

"Plaintiffs") by their attorneys, Cultiva Law PLLC, as and for their Complaint against Gordon

Thomas Honeywell LLP, Ryan Espegard, and Lee Owens (collectively "Defendants") respectfully

allege as follows:

                            Facts Common to All Claims for Relief

                                    Nature of the Action

        1.      This is a case about a lawyer, his law firm and their client working together to

commit a fraud and breach of trust so brazen and offensive that it is almost unbelievable.

Unfortunately for Plaintiffs, it is very much true.

        2.      While Defendants', and particularly Defendant Espegard's, improper conduct was

so extensive and so appalling that it is difficult to comprehensively condense it, an attempt at a

summary follows:

        3.      In May 2014, Plaintiffs Anderson and Vicioso, a married couple and respectively a

successful entrepreneur and doctor, were put into contact with Ryan Espegard of Gordon Thomas

Honeywell, a young attorney looking to build a practice in Washington's burgeoning cannabis

market. At that time, Anderson and Vicioso were interested in acquiring the rights to one or more Washington State licenses to produce cannabis (since Anderson and Vicioso did not yet meet Washington State residency requirements at that time, it was necessary that they partner with a resident with a valid license), and to ultimately develop and expand a legal cannabis producing and manufacturing business in Washington.

4.     In May and early June of 2014, Anderson, Vicioso and several members of their legal and business team participated in multiple phone calls and meetings with Espegard, who was based in Gordon Thomas Honeywell's Seattle office. Anderson and Vicioso explained to Espegard their business objectives, negotiating strategy, and available resources. They also provided Espegard with sensitive confidential information including the financial risks they were taking to pursue this venture. In these attorney-client communications, Espegard advised Anderson and Vicisoso regarding the cannabis market in Washington and the regulatory landscape. He advised them regarding the going rate for licenses and they discussed specific individuals from whom they could negotiate for the purchase of a license, or multiple licenses.

5.     After agreeing that Michael Reid, a practicing Washington attorney who held the rights to multiple licenses, was the person Anderson and Vicioso would try to partner with, Vicioso corresponded with Reid regarding the contours of a transaction. Specifically, Vicioso and Reid agreed to the parameters of a deal where Anderson and Vicioso (or a business controlled by them) would purchase four licenses from Reid for $100,000 each and for Reid receiving a 2% interest in Anderson and Vicioso's business. Anderson and Vicioso then turned things over to their attorney, Espegard, to negotiate the final terms of the deal with Reid.

6.     But shortly after agreeing that Reid was the person they would move forward with and having laid out their entire negotiating strategy, including worst case scenario, long term game

C&F: 3690002.2

plan, and sensitive financial and personal information to their attorney, Espegard, Espegard called Vicioso and told him that he and Anderson could not move forward on a deal with Reid, because Reid was a convicted felon. Espegard explained to Vicioso that he and Gordon Thomas Honeywell had done some background research into Reid and learned that he was a felon, who would ultimately be unable to obtain complete approval from the state Liquor and Cannabis Board ("LCB"). This was a lie. As Vicioso and Anderson learned only a few weeks ago, Reid has no criminal record at all. Espegard went on to tell Vicioso that every potential license holder that the group had discussed had a criminal history except for Lee Owens, who Espegard advised was the person from whom Anderson and Vicioso should purchase a license.

7.      Espegard also noted that Lee Owens was a client of Espegard's and Gordon Thomas Honeywell, and thus he would not be able to represent Anderson and Vicioso in a negotiation with Owens for the purchase of Owens' license, but that Espegard would represent Owens instead. Espegard told Vicioso and Anderson that this arrangement was best for all parties, because he knew exactly what Anderson and Vicioso were looking for and he knew what Owens wanted to accomplish, thus he was an ideal person to bring the deal together. He further informed Anderson and Vicioso that they should retain a new attorney, but he advised them that it would be best if they did not tell that new attorney that they had previously discussed this matter with Espegard.

8.      In other words, after gathering sensitive, confidential information about finances, objectives, and negotiating strategy regarding a specific business transaction from his clients, Espegard switched sides and represented the counterparty who he had steered his now former clients to. And he told those now former clients not to mention to their new attorney that he had been representing them previously.

3

9. As their attorney had advised them that Owens was the only non-criminal that they could do business with, Vicioso and Anderson felt they had no choice but to move forward with Owens and trusted Espegard's representation that he would be able make bring together a deal that was beneficial for them.

10. Owens then used the confidential information that Espegard provided him to extract the most financial and other concessions possible in his negotiations with Anderson and Vicioso. Whereas the going rate for license rights on the market in mid-2014 was approximately $100,000 per license – which is consistent with the preliminary deal Vicioso had struck with Reid – Owens demanded $2 million paid out over several years for his single license. This was, of course, after Anderson and Vicioso had explained to Espegard, while he was acting as their attorney, that in a worst-case scenario they could pay over $1 million for a license if the payment was spread out over several years.

11. Espegard, on behalf of Owens, also negotiated for part of the consideration for Owens to be that Anderson and Vicioso would pay the legal fees that Owens owed to Gordon Thomas Honeywell in connection with his initial license application.

12. Having (1) already remortgaged their house, (2) Vicioso having already wound down his medical practice, and (3) having been advised by their attorney that Owens was the only person with whom they could do business that did not have a criminal record, Vicioso and Anderson believed that this was the best and really only deal they could strike and signed a series of agreements in which they agreed to work with Owens to obtain final LCB approval (i.e. a license to produce cannabis) and to purchase his license for a total of $2 million paid out over ten years. Things would get worse.

4

13.     In October 2014, Vicioso and Anderson met Owens in person for the first time. At that initial meeting Owens demanded that in addition to the $2 million they were going to pay him (and his legal fees to Gordon Thomas Honeywell, which they were going to cover) he wanted to own a piece of Anderson and Vicioso's business. Owens told them that he knew that they were highly leveraged, he knew that they had remortgaged their home, he knew that Vicioso had left his medical practice and they had no other option but for this venture to succeed, and he knew that they had offered Michael Reid an interest in their business – all information that Owens obtained from Espegard. Owens threatened that if Anderson and Vicioso did not give him an ownership interest in their business he would tank the deal and then "what are you going to do?"

14.     Reluctantly, Anderson and Vicioso agreed to his demands as they recognized that Owens was right – having highly leveraged themselves, relocated their family and three children all under the age of five to Washington, and leaving Vicioso's medical practice to pursue this venture, they had no other options but to make this work. Accordingly, the parties entered into an amended agreement, dated October 29, 2014. Under the agreement, Anderson, through an entity that she controlled, Green Kiss USA, Inc. ("Green Kiss"), would have an option to purchase 100% of the common membership interest of L & D Holdings LLC, the company through which Owens held the license rights, in exchange for a $50,000 exercise price, granting Owens a 1% interest in Green Kiss, paying Owens $2 million over ten years, and paying Owens' legal fees to Gordon Thomas Honeywell. The option would only become ripe if the LCB ultimately approved full licensure for L & D Holdings. Until the option was exercised, Owens would continue to have full control of L & D and would manage the business.

15.     Despite Owens' extortion of Anderson and Vicioso and Espegard's improper and unethical conduct – the full extent of which Anderson and Vicioso did not understand until later –

C&F: 3690002.2

the parties' interests were united at this point. They needed to work towards procuring the license from the LCB. And since Owens' and Anderson and Vicioso's interests were now aligned, Espegard started to advise them jointly on how to proceed and procure the license.

16.     One of the primary items the parties needed to address was that for the LCB to give the final license, the license applicant[1] (L & D and Lee Owens here) needed to provide the LCB with a lease for a facility, meeting LCB requirements, in which it could produce cannabis.

17.     In November 2014, SEO Development, a company founded and managed by Anderson, procured a lease for a 30,000 square foot facility in Tacoma, WA, and began a massive and costly renovation. While the landlord of the facility was happy to enter into the lease with Anderson's company, SEO, based on Anderson and Vicioso's excellent background checks and financial records, when approached with the idea of the facility being subleased to an entity controlled by Owens, he refused, saying he did not want to have anything to do with Lee Owens.

18.     Espegard stated that he was unconcerned with this development and advised that Owens and Anderson take the existing lease between the landlord and SEO and make essentially a mirror lease from SEO to L & D. Hilary Bricken, who was acting as counsel to Anderson and Vicioso at this time, advised that they could submit a draft lease to the LCB and explain that SEO and L & D intended to enter into that lease in order to keep the LCB licensing process moving forward. After several drafts of the lease were exchanged between Espegard, Anderson, and Bricken, Espegard submitted an executed version of the lease, for which there was no landlord consent, to the LCB and (unbeknownst to Anderson and Bricken) represented to the LCB that it was a fully valid agreement in or around December 2014.

---

[1]A party was not a full license holder until the LCB gave a final license permitting the license holder to produce cannabis. For ease of reference, this Complaint refers to parties with pending applications for licenses license applicants.

6

19.     Then, in or around February 2015, after receiving feedback from the LCB about the lease, Espegard submitted another executed lease, again with no landlord consent, and again representing that it was a fully valid agreement, to the LCB. Around this same time, Anderson wrote to Espegard stating that now that she and Owens were working towards the same goal and no longer acting as counterparties, she wanted to use Espegard as her attorney. From that point on, through the rest of 2015 and into 2016, Espegard acted as attorney for both Owens and Anderson, advising them and guiding them through the LCB licensing process.

20.     Anderson, Vicioso, and SEO, which had been funded by Anderson, Vicioso and SEO's other member, spent over $1.5 million renovating the facility and purchasing equipment to grow cannabis in an LCB-approved, state of the art facility. As the buildout was ongoing throughout 2015, Anderson was in frequent contact with Espegard who advised her regarding the process of obtaining a final license. Once the building was ready to become operational, Espegard guided Anderson, and to a lesser extent Owens, through the final steps of obtaining a license.

21.     Specifically, in October 2015, Espegard advised that Anderson, rather than Owens, should take the LCB Traceability Test – essentially a test showing that the license applicant understands the rules and regulation regarding the production, handling and sale of marijuana. Per Espegard's advice, Anderson with help from Vicioso, took and passed the test. Anderson and Vicioso have since been advised that it was illegal for anyone other than the license applicant to take the test.

22.     On October 20, 2015, the LCB conducted its final inspection of the facility and gave its approval. The final license was issued to L & D Holdings on or about November 2, 2015.

23.     Per the parties' agreements, Anderson, through Green Kiss, now had the option to purchase the common membership interest of L & D. But, as the parties were aware and as the

C&F: 3690002.2

Option Agreement provided, prior to Green Kiss exercising the option, Owens fully controlled L & D and would manage the business until Anderson exercised the option.

24.     But, just after the final inspection, for the first time, Owens told Vicioso and Anderson that Owens would not be able to run the business at all, and it would instead fall upon them to do so. Espegard then disclosed to Anderson, for the first time, that L & D Holdings was a shell company with no assets, no employees, and no ability to even establish a bank account. This meant that it was impossible for L & D and Owens to perform per the Option Agreement, per the parties' understanding, and per the way Owens and Espegard had always represented that the business would be run until Anderson exercised the option.

25.     Having this bomb dropped on her, Anderson consulted with Espegard regarding how to manage the business prior to Green Kiss fully exercising its option. Espegard advised that since L & D had no assets and Owens had no money to contribute towards the company, L & D should be run as d/b/a so that it could be run through an existing Green Kiss business and SEO, which already had an existing relationship with the Green Kiss entity – i.e. L & D Holdings, d/b/a Green Kiss. Espegard explained that this set up complied with LCB rules regarding financing.

26.     Per the advice of their attorne,y Anderson and Vicioso moved forward with Vicioso managing the day to day affairs of the business, which was being run through Green Kiss under the d/b/a, which Espegard set up, until February 15, 2016 when Anderson exercised the option through Green Kiss.

27.     During the months of November 2015 – June 2016, Anderson and Vicioso (primarily through SEO) put over $100,000 per month into the business to cover costs of employees and materials. This was in addition to the startup costs that they had spent individually

C&F: 3690002.2

and through SEO on leasing and renovating the property. In total, Plaintiffs spent well in excess of $2 million.

28.     That money was lost. Shortly after Green Kiss exercised its option, during a routine examination, the LCB identified issues with the way in which L & D had been managed and financed prior to Green Kiss exercising the option.

29.     In June 2016, the LCB entered the Tacoma facility and ordered that it be shut down and the business wound down (with materials being either destroyed or sold) based on multiple violations, including L & D being financed and managed by Anderson and Vicioso rather than Owens prior to Green Kiss exercising the option, as at that time only Owens and his company were approved to manage and finance the company.

30.     Anderson and Vicioso both reached out to Espegard for advice on how to respond to the LCB inquiries. After initially telling them to cooperate but run everything by him first, Espegard told Anderson and Vicioso that they should disappear. Specifically, he told them to go back to New York, to delete their email accounts and get new cell phone numbers – i.e. to destroy evidence – and that he would take care of everything.

31.     Having been defrauded by their attorney and business partner, having unknowingly and under the advice of counsel, violated multiple LCB regulations, and having lost in excess of $2 million, Anderson and Vicioso did what Espegard advised (except for destroying evidence) and went back to New York to try to pick up the pieces of their lives.

32.     After spending two years trying to climb out of the financial hole Espegard and Owens threw them into and trying to put a dark chapter of their lives behind them, the nightmare came back this summer when Anderson and Vicioso were served with a summons and complaint for a lawsuit brought by Lee Owens for a breach of contract – alleging in sum and substance that

9

Anderson and Vicioso owed him $2 million under their prior agreements and that they had caused L & D to lose its LCB license.

33.     Owens' attorney of record in the lawsuit: Ryan Espegard, Esq., Gordon Thomas Honeywell.

34.     Plaintiffs bring this action for fraud, malpractice, breach of fiduciary duty, and negligent misrepresentation.

<u>The Parties, Jurisdiction and Venue</u>

35.     Plaintiff SEO Development is a limited liability company formed pursuant to the laws of the state of Washington. SEO Development LLC's sole member is Ann Anderson who resides in New York.  Accordingly, for diversity purposes, SEO Development has New York citizenship.

36.     Plaintiff Ann Anderson is resident of New York. Anderson is the sole member and manager of SEO Development.

37.     Plaintiff Edwin Xavier Vicioso is resident of New York. Vicioso is married to Anderson.

38.     Defendant Gordon Thomas Honeywell LLP is a law firm with offices in Seattle and Tacoma, Washington. Upon information and belief, Gordon Thomas Honeywell has the citizenship of Washington for diversity purposes.

39.     Defendant Ryan Espegard is an attorney working in the Seattle office of Gordon Thomas Honeywell. Upon information and belief, Espegard is a Washington resident.

40.     Upon information and belief, Defendant Lee Owens is a Washington resident.

41.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) based on the residency of the parties and the amount in controversy.

C&F: 3690002.2

42. Upon information and belief, Defendants all transact and solicit business within the territorial confines of the Western District of Washington. And the primary events complained of herein took place within this district.

Background: Anderson and Vicioso become interested in entering the legal cannabis market

43. Vicioso is an anesthesiologist. In the years prior to 2014, Vicioso and several medical professionals that he regularly worked and consulted with became interested in the medical use of cannabis. Based on anecdotal evidence, research, and specific cases that Vicioso was aware of he (along with many of the other medical professionals in his circle) developed a firm belief in the medical benefits of cannabis.

44. When, in 2014, Washington legalized the use of recreational cannabis and announced that it would be granting a limited number of licenses for its commercial production, Anderson and Vicioso decided to explore the possibility of entering into the market and building a business involved in the production and wholesale of cannabis.

45. Vicioso discussed the business venture with some of his colleagues and began to solicit investors and raise funds for the potential venture. Anderson and Vicioso also asked their existing attorneys and legal team to identify professionals in Washington that they could partner with.

46. One of the first people in the Washington cannabis market that Anderson and Vicioso were put in contact was Tom Gordon, a broker, who was involved in the sale of licenses issued by the LCB.

47. When Washington legalized cannabis, the state announced that it would cap the number of production licenses it issued under a "canopy." Once the canopy was reached, the state would institute a moratorium. In other words, once the state had granted final approval for a

C&F: 3690002.2

specific amount of cannabis to be produced, no more licenses would issue. But, the license process was not as simple as merely applying and paying a fee with some background check. Rather, the first step was that an applicant would apply and pay a small fee to obtain license rights. In order to obtain full licensure and the right to produce cannabis, the applicant would have to meet specific LCB requirements, including, inter alia, (a) having a lease, which satisfied specific LCB requirements, (b) improving the leased facility so that cannabis could be safely produced there and so that the facility met LCB regulations and requirements, (c) showing that the license holder had sufficient funds to run their business and the source of those funds, and (d) passing a test to show that the license holder understood how to safely manage the production of cannabis and that the license holder was aware of the regulations she or he would be subject to. Accordingly, while the LCB accepted thousands of applications for licenses and there were many license applicants with pending applications, only the applicants who satisfied the above conditions prior to the canopy being reached would procure final licenses.

48.     This landscape created (1) a market for already in process license applications, (2) time pressures for parties seeking to obtain licenses, and (3) substantial risk in that anyone seeking a license would have to spend substantial sums to obtain the use of and greatly improve a facility before they could even obtain the final license – meaning there was a potential to spend hundreds of thousands or millions of dollars renting and improving a facility, but not being able to obtain the final license before the canopy was hit and the moratorium instituted.

49.     An additional issue for Vicioso and Anderson was that Washington state had certain residency requirements for license holders. Therefore, Vicioso and Anderson could not immediately purchase or apply for a license. Instead, if they were to enter the market, Anderson

C&F: 3690002.2

and Vicioso would have to partner with a license holder or license applicant. This is where Tom Gordon came into the picture.

50.     Vicioso first started corresponding with Gordon (Vicioso was typically the primary point of contact and was acting on behalf of himself and his wife) in or around May 2014. At that time, the going rate for the purchase of license rights was approximately $100,000 per license. Gordon advised Vicioso regarding the market and potential sellers of license rights whom Gordon was aware of. One of the potential license sellers identified by Gordon was a Washington attorney named Michael Reid, who held the rights to multiple licenses.

51.     Vicioso and Anderson thought Reid would be an ideal person to partner with. While many of the individuals who held license rights or license applications were formerly involved in the illicit production and sale of marijuana, Reid by all appearances was a respected professional with a clean background. Accordingly, Gordon reached out to Reid on behalf of Anderson and Vicioso and Vicioso had some initial conversations with Reid in which they discussed a potential sale of Reid's license rights.

Anderson retains Espegard

52.     Gordon also helped Vicioso and Anderson find an attorney who could guide them through the new and completely foreign cannabis regulatory environment. For this, Gordon introduced them to Ryan Espegard of Gordon Thomas Honeywell.

53.     In May and then early June 2014, Vicioso and Anderson corresponded with Espegard via email and telephone calls. Espegard, a young attorney charged with heading up a cannabis regulatory practice for Gordon Thomas Honeywell, explained to Vicioso and Anderson that he was eager to build a practice in this new and growing area and that he was excited to work with them on what was a new and challenging but potentially rewarding endeavor for everyone

13

involved. Espegard struck Anderson and Vicioso as bright, ambitious, and honest and they believed he was the right attorney for them to work with.

54.     In or around mid-May 2014, Anderson and Vicioso had their first substantive phone call with Espegard. In addition to Vicioso and Anderson, their personal attorney and several members of the legal team of Anderson's business were on the call. Additionally, a senior employee from Anderson's business flew out to Seattle to meet with Espegard on Anderson's behalf and was present in Espegard's office. On that call, Vicioso explained his and his wife's objectives to Espegard. He explained what their resources were, where they were acquiring funding (including a $500,000 home equity loan), and how much they were willing to spend in procuring a license. Espegard discussed the market for licenses and the regulatory market generally with them. The parties also discussed specific potential license sellers with whom they could negotiate. The parties agreed that they would focus efforts on purchasing license rights from Michael Reid.

55.     Espegard also noted that a client of his, Lee Owens, was in the market to sell a license.

56.     In or about the last two weeks of May 2014, Vicioso continued to correspond with Reid, and he and Reid ultimately came to an understanding on the main terms of a transaction. Specifically, they agreed that Anderson, through an entity that she controlled, would purchase Reid's rights in four licenses. In exchange, Reid would be paid $400,000 ($100,000 per license), and Reid would receive a 2% interest in the business that would ultimately hold the licenses. As a sign of good faith, Reid asked that Anderson and Vicioso establish an escrow account with their attorney before they moved towards finalizing the deal.

C&F: 3690002.2

57.     Vicioso also told Reid that their attorney was Espegard and that Espegard would complete negotiations on their behalf.

58.     In late May and into early June, Vicioso emailed with Espegard regarding setting up the escrow account and moving forward with (1) Espegard as their attorney and (2) purchasing four licenses from Michael Reid. They also scheduled a conference call to go over final strategy before Espegard tried to close the deal with Reid. Espegard wrote to Vicioso that he would contact Reid and let him know that Espegard represented Anderson and would be in touch after discussing matters further with his client.

59.     On or about June 2, 2014, the parties had another all hands on deck call with Espegard, which again involved Anderson, Vicioso, their personal attorney, and multiple members of Anderson's business' legal team. On this call, they further refined their strategy for closing a deal to purchase a license. Espegard asked how high of a price they were willing to pay in a worst-case scenario. Vicioso explained that they could probably pay a price of as much as 7-figures per license if it was spread out over several years.

60.     The parties ended the call with the plan being for Espegard to contact Reid and attempt to finalize a deal where Anderson would purchase Reid's licenses for $100,000 per license and a 2% interest in the business.

Espegard fraudulently steers Anderson and Vicioso to doing business with Owens

61.     Shortly after this June 2, 2014 call, Espegard called Vicioso and told him that he and Gordon Thomas Honeywell conducted background research into Reid, and into the other potential license sellers Espegard had discussed with his clients, and that they learned the Reid was a convicted felon. Espegard explained that because of this it would ultimately be impossible for Reid to achieve full licensure from the LCB. Espegard told Vicioso that not only were their

15

issues with Reid's history, but that all the potential license sellers that the parties had discussed had criminal backgrounds expect for Lee Owens – Espegard's client.

62.     Unbeknownst to Vicioso and Anderson, as of June 2014, Owens had a substantial outstanding balance due to Gordon Thomas Honeywell for work the firm had performed for him. Upon information and belief, Espegard was eager to collect this receivable.

63.     Espegard advised Vicioso that since Owens was the only potential seller with a clean record, Anderson should buy a license from Owens. Espegard further advised Vicioso that since Espegard represented Owens, he would not be able to represent Anderson on a transaction where she was purchasing Owens's license, but that he could still be of service to all parties involved. Espegard explained that since he had extensively communicated with Anderson and Vicioso and understood exactly what they were trying to accomplish, and since he was familiar with Owens's objectives, Espegard would be well positioned to bring about a deal beneficial to all.

64.     Espegard told Vicioso that he did not believe that he had obtained any sensitive information from Anderson and Vicioso and to the extent he had he would not share that with Owens so there was nothing for Anderson or Vicioso to be concerned about. Espegard further advised Vicioso that he and Anderson should retain another attorney to help finalize the transaction on their behalf, but recommended that neither Anderson nor Vicioso tell that new attorney that they had previously worked with Espegard on this transaction. Believing that Espegard was trustworthy based on their contact with him to date, unfamiliar with the business they were entering into, and working quickly because of the time pressures involved in LCB license market, Vicioso and Anderson believed Espegard's representations and followed his advice.

C&F: 3690002.2

65.     Espegard did not obtain, or seek to obtain, a written waiver from Anderson expressly permitting him to represent Owens in negotiating the contemplated transaction.

66.     Anderson and Vicioso then retained Hilary Bricken of Harris & Moure to serve as Anderson's counsel in negotiating and finalizing the purchase of Owens' license. Per Espegard's advice, they did not advise Bricken that Espegard previously served as Anderson's attorney.

67.     Bricken began to negotiate with Espegard and a broker retained by Owens. Whereas the market for licenses at that time was approximately $100,000 per license, Owens asked for $2 million for his single license in payments spread out over several years. Essentially, Owens' negotiating position was that he would only sell his license for the amount that Anderson and Vicioso had explained to Espegard, when he was Anderson's attorney, was the absolute most they would be willing to pay.

68.     Bricken continued to negotiate with Espegard on the transaction. In addition to the $2 million Owens was requesting, Owens, via Espegard, demanded that part of his compensation be that Anderson and Vicioso pay the legal fees that Owens owed to Gordon Thomas Honeywell.

69.     In or around August 2014, the parties finalized and executed an agreement in which, once Owens' company, L & D, obtained final license approval from the LCB, Anderson, through her company Green Kiss USA, would have the option to purchase all of the common interest in L & D Holdings in exchange for (1) a $50,000 option fee, (2) $2 million paid out over ten years, and (3) payment of Owens' legal fees to Gordon Thomas Honeywell. Owens and Espegard also made it a requirement of the agreement that Anderson and Vicioso personally guarantee the payment to Owens.

70.     Per the agreement, until Anderson/Green Kiss exercised the option, Owens would remain manager of L & D and would run the business. This was consistent with what the parties

17

discussed during negotiations: after acquiring the final license the option would become ripe, Owens would continue to have full control over L & D and would manage L & D and pay for the initial costs of running the business until the option was exercised at which time Anderson/Green Kiss would take control of L & D, Owens would be reimbursed for the funds he had put into the business for its initial operations, and Owens would receive his $2 million in the form of what were essentially preferred stock payments made by L & D to him over the next ten years.

71.     Around this time, August 2014, Anderson formed SEO which would serve as the vehicle through which Vicioso, Anderson, and SEO's other member (SEO initially had two members) would invest funds for the purposes of procuring and improving a facility so that it satisfied the exacting requirements of the LCB for the production of cannabis.

Owens uses confidential information provided by Espegard to retrade the parties' agreement

72.     In or around September 2014, Anderson and Vicioso relocated their young family to Washington. They had three children, all under five years old at the time. By this time, Vicioso had left his medical practice and the couple had borrowed $500,000 against their home and raised other investor funds. They were all in. And, they were all in with Owens. Because of the time pressures involved due to the license cap that Washington had announced, there would be no time for Anderson and Vicioso to start from scratch if their deal fell through with Owens.

73.     Because of information that Espegard had provided Owens regarding his former clients, Owens knew how vulnerable Anderson and Vicioso were. When Owens first met his new business partners, he used this information to his advantage.

74.     In October 2014, Anderson and Vicioso met Owens for the first time. Owens arrived at the meeting wearing a Hawaiian shirt and flip flops. Shortly after cordial introductions, Owens revealed that he knew the risks that Anderson and Vicioso were taking and he knew that

18

C&F: 3690002.2

they were past the point of no return. Owens said he knew that Anderson had been willing to give Michael Reid a piece of ownership in her business and that he wanted the same deal (nevermind that the 2% interest offered to Reid was part of a transaction where licenses were priced at $100,000 each and not $2 million). Owens said he knew that Anderson and Vicioso were highly leveraged, he knew they had already expended substantial sums that they could not recoup absent a successful business, he knew that Vicioso had stopped practicing medicine, and that even though Owens already had an agreement with Anderson, unless she agreed to an amendment or addendum providing him with an interest in her business, he was going to tank the deal.

75.     Owens was correct about Anderson and Vicioso's vulnerability, and Anderson and Vicioso knew it. Even with a signed agreement, they needed Owens' cooperation to procure the final license and to initially run the business, otherwise they were done. Accordingly, Anderson reluctantly agreed to amend the parties' agreement so that Owens would be granted a 1% interest in Green Kiss as additional consideration for the option.

76.     Owens and Anderson executed the Amended Option Agreement on or about October 24, 2014. As with the earlier agreement, it provided that Owens would retain control of L & D and be fully responsible for managing and running its business until the option was exercised.

77.     Once the Amended Option Agreement was executed, the parties' focus shifted to doing all the work required to obtain final license approval from the LCB. The parties and their attorneys were aware of the time pressures involved and understood all work and investment would be for naught if they were not able to achieve LCB approval prior to institution of the moratorium.

<u>The parties focus on working together to obtain a final license</u>

78.     In recognition of the parties' alignment of interest, the Option Agreement contained covenants from Anderson and Owens that they would in good faith seek final licensure for L & D.

19

79.     The most significant undertaking to obtain a final LCB license was to obtain a lease for L & D for a facility that met LCB standards in which marijuana could be processed and produced. The LCB had stringent requirements regarding the contents of any such lease, and more importantly had stringent requirements regarding the facility itself and the safety and security measures that had to be in place. Thus, before the LCB would approve a final license for L & D, the parties had to (1) have a valid, LCB approved lease, and (2) had to have an improved facility meeting all LCB requirements ready for the production of cannabis. Merely having a lease for a facility was insufficient, the facility itself needed to be fully improved and meet all LCB requirements before the LCB would issue a license.

80.     Per the parties' agreement, Anderson was responsible for obtaining an appropriate facility. In November 2014, in reliance upon the existing Amended Option Agreement and the terms and representations therein, SEO leased an approximately 30,000 square foot facility in Tacoma and began the substantial and costly process of completely renovating it into a state of the art cannabis production warehouse.

81.     Around the same time, Espegard focused on submitting a lease to the LCB for its approval. Since L & D was the license applicant, Espegard needed to provide the LCB with a lease where L & D was the tenant.

82.     When Anderson approached the landlord, That Other Stuff, LLC, regarding SEO subleasing the facility to L & D, the landlord refused. While the landlord had been happy to lease his facility to a company backed by Anderson and Vicioso, who he knew intended to use it for marijuana processing, he said he would not have anything to do with a company associated with Lee Owens.

C&F: 3690002.2

83.     When Anderson reported this to Espegard, Espegard advised that it was not a problem and that the parties should still move forward and submit a lease from SEO to L & D to the LCB to keep the application process moving forward. Anderson's attorney Bricken, noted that they could submit an unexecuted lease to the LCB and explain that the parties intended to enter into that lease, thus finalizing an agreement with landlord approval was not imperative at that time.

84.     Espegard advised that Anderson take the lease from That Other Stuff to SEO and create a new lease, which essentially mirrored its terms but with SEO leasing the space to L & D. Anderson, Espegard, and Bricken then exchanged drafts of such a lease, with modifications so that it complied with LCB requirements throughout November and December 2014.

85.     Based on conversations and correspondence with Espegard and Bricken, Anderson understood that Espegard would submit the lease to the LCB as the lease the parties intended to enter into. Since, the lease did not contain a landlord consent exhibit, it could not be fully valid. Unbeknownst to Anderson, and upon information and belief, unbeknownst to Bricken, Espegard submitted an executed copy of the lease to the LCB and represented that it was a valid agreement when it was not.

86.     After the LCB provided comments on the lease and asked that certain changes be made, Espegard communicated the requested changes to Anderson and circulated updated versions of the lease. In or around February 2015, Espegard again submitted an executed version of the lease to the LCB and represented that it was a valid agreement. While Anderson was aware Espegard was submitting the lease to the LCB, it was only in 2016 that she learned that Espegard was representing that it was a fully executed and fully valid agreement as opposed to the intended agreement of the parties.

21

Espegard becomes counsel for Anderson and Owens

87.    In early February 2015, around the same time that unbeknownst to Anderson or Bricken Espegard was defrauding the LCB, Anderson wrote to Espegard stating that moving forward she wanted Espegard to act as her attorney. In Anderson's view, her and Owens were now in a partnership of sorts with interests that were totally aligned – obtaining an LCB license and successfully running a business thereafter – thus it made sense that Espegard guide them the rest of the way as he had been the primary point of contact with the LCB and had been giving advice to both Owens and Anderson regarding LCB licensure issues.

88.    Thereafter, from February 2015 and into early 2016, Espegard acted as counsel for Anderson and Owens jointly. He communicated directly with Anderson and Owens with no other counsel. He advised Anderson regarding the licensing process. He communicated information to the LCB on behalf of Anderson. While Owens was included on most of these communications, he was typically nothing more than a cc on the emails. Throughout 2015, it was almost exclusively Anderson and Espegard working together to obtain the final license. Based on Espegard's conduct, Anderson reasonably understood that Espegard was both Owens' and her attorney for purposes of obtaining an LCB license and operating the business in conformity with LCB regulations.

89.    Throughout 2015, Anderson and Vicioso, through SEO, were heavily involved in the renovation and build out of the Tacoma facility. Through SEO, Anderson, Vicioso, and other investors spent into the millions of dollars to renovate the facility so that it achieved LCB approval.

90.    Vicioso made various business trips, including a trip to Asia to purchase state of the art equipment to be used at the facility. At the same time, Anderson and Espegard stayed in regular contact so that they could keep the LCB apprised of their progress and could answer any questions the LCB had.

C&F: 3690002.2

91.     By the end of the summer/early fall of 2015, the Tacoma facility was nearly ready for final LCB inspection and approval, and the parties focused on the final steps of achieving a license.

92.     In addition to demonstrating to the LCB that the license applicant had a facility in which it could safely produce cannabis, a license applicant needed to disclose to the LCB how the business was going to be financed and the license applicant needed to take and pass the LCB Traceability Test to demonstrate that the license applicant understood the regulations he or she would be subject to and would be able to safely and legally handle the production of cannabis.

93.     While L & D was the license applicant, the LCB had been provided with the Amended Option Agreement and was aware that Anderson, via Green Kiss, was going to be ultimately acquiring the license once she exercised the option. Accordingly, Anderson had multiple interviews and phone calls with LCB investigators in which she explained to them how she would finance operations of the company once she exercised the option and obtained the license. In these communications, Anderson disclosed to the LCB that she and Vicioso had borrowed $500,000 against their New York home and disclosed the source of all funds that she would be using to initially run the business prior to it generating enough revenue to support itself.

94.     Owens, as the manager of L & D, was also required to take part in multiple interviews and phone calls with the LCB and presumably to provide it with the same information that Anderson did – i.e. the source of funds that he would use to run the business prior to Anderson exercising her option. Upon information and belief, Espegard participated in the interviews and calls between Owens and the LCB.

95.     In or about early October 2015, the LCB sent a link to Owens to take the Traceability Test. After receiving the link, Owens forwarded it to Anderson. In his email, in which

C&F: 3690002.2

Espegard was copied, Owens stated that Espegard had suggested that Anderson was better suited to take the test. This was likely true as it had been Anderson who was the primary point of contact with Espegard discussing all legal issues surrounding LCB licensure and LCB rules and regulations.

96.    After Owens sent this initial email in early October 2015, Espegard sent multiple emails to Anderson asking if she had completed the test, stressing the need for her to complete the test so that a final inspection of the facility could be scheduled, and offering to re-send the link if Anderson was having any issue accessing it.

97.    In October 2015, Anderson with Vicioso's assistance took and passed the LCB Traceability Test. After so doing, she informed Espegard.

98.    Espegard then worked with the Anderson, Owens and the LCB to schedule the final inspection of the Tacoma facility. If the LCB approved the facility as being ready for use and compliant with LCB regulations, the final license could be issued shortly thereafter.

99.    On or about October 20, 2015, the LCB conducted the final inspection of the facility in Tacoma. Owens and Vicioso were present for the inspection. At the inspection, the LCB investigator examined the premises and discussed with Owens and Vicioso the rules and regulations the business would be subject to.

100.    After the facility passed the final inspection, the LCB issued a "Tier 3" license to L & D Holdings.

101.    For approximately a year prior to the license being issued, the parties were aware that initial funding of the business would be an issue. Whereas in the negotiations in 2014, Owens had represented that he had $500,000 to contribute to initial operating costs, he later revealed that he actually only had about $30,000.

C&F: 3690002.2

102.    Accordingly, the parties set up an escrow account which Owens could use to reimburse himself for funds he spent on the business while he ran it until Anderson exercised her option.

103.    But, it was only after the final inspection was completed and shortly before the license was issued that Owens told Vicioso that despite the Option Agreement stating that Owens would run L & D until Anderson exercised her option, he could not and would not do so. For the first time, Owens stated that he did not have the mental capacity to run the business and that it would fall on Anderson and Vicioso to do so.

104.    Several years and several millions of dollars into this venture, Anderson and Vicioso tried to figure out what to do now that Owens was stating he could not comply with their agreement – or live up to the promises that he and Espegard had made all along about him running the business and having at least some money to pay for initial expenses.

105.    Anderson and Vicioso contacted Espegard to determine how they could legally manage and pay for the business in the period before Anderson exercised her option. At this time, Espegard dropped another proverbial bomb on Anderson and Vicioso. He disclosed to them that L & D was a complete shell. It had no employees, no assets, and did not even have a bank account or the ability to open one. Espegard further informed Anderson and Vicioso that Owens essentially had no money – he did not even have the $30,000 (already reduced from $500,000) that he stated he had.

106.    While Anderson's and Vicioso's sole focus at this time was on how to legally run and pay for the business, Owens' and Espegard's disclosures beg the question of what statements Owens and Espegard made to the LCB during Owens' LCB interviews and calls. Since the LCB required license applicants to disclose how they would finance the business and since it turns out

25

that Owens had no means to finance the business at all, upon information and belief, Owens with the assistance and participation of Espegard made false statements to the LCB regarding his ability to fund and manage the business prior to Anderson's exercise of the option.

107.   Concerned with saving their multi-year and multi-million dollar investment, Anderson asked Espegard how she could legally pay for and run the business prior to the option being exercised. Espegard advised that Anderson and Vicioso could not directly pay for the company's expenses because Anderson had not yet exercised the option and had not yet been added to the license by the LCB. Instead, Espegard advised that Anderson use SEO to fund the business by setting up a d/b/a for L & D. Espegard explained that since SEO already had a working relationship with one of Anderson's family of Green Kiss companies, they could legally fund the business by creating the d/b/a for L & D of L & D Holdings d/b/a Green Kiss. According to Espegard this created a workaround where Anderson and Vicioso would not be funding L & D's operations, rather SEO, a Washington-based LLC would. The d/b/a would further allow L & D (a complete shell with not even a bank account) to have access to funds needed to pay company expenses. Espegard expressed that he was certain this would pass muster under LCB financing rules and stated that in a worst-case scenario, if the LCB found this set up to be improper the result would be that Owens would be required to pay back SEO the funds it had spent on operations.

108.   Espegard then set up the d/b/a and Vicioso oversaw a team running the business.

109.   Owens visited the warehouse on occasion but played no role in managing the business. When he received communications from the LCB regarding policies or procedures that L & D was required to comply with, he would forward them to Anderson and Vicioso.

110.   On or about February 15, 2016, Anderson, through Green Kiss, exercised the option and became the 100% owner of all the common membership interests in L & D Holdings.

26

Immediately, Anderson and Vicioso made all employees direct employees of Green Kiss. They had previously been independent contractors as L & D without even a bank account had no ability to hire employees.

111.    Anderson and Vicioso continued to run the business in compliance with all relevant laws and regulations. They paid all necessary taxes, complied with LCB rules and regulations and were responsive to any LCB inquiries.

112.    Business, however, was sluggish and the venture lost money every month. In or around May 2016, Anderson and Vicioso tried to recruit investors to help them deal with mounting costs. After one investor performed his diligence on Green Kiss and L & D, he declined to make an investment and explained to Vicioso and Anderson that it appeared to him that the LCB license had been illegally financed and managed.

113.    The investor raised concerns with the fact that it appeared that the lease submitted to the LCB was incomplete in that it did not contain landlord approval and he also noted that it was improper for the company to have been financed using funds from SEO, which was not an approved financier by the LCB.

114.    Shortly thereafter, in or about June 2016, Anderson shared these concerns with Espegard and asked him for help regarding how to address the issues raised by the potential investor. Espegard repeated his earlier advice that if the LCB determined the initial financing arrangement was improper, it would only be a minor matter where the LCB might require money that should not have been used to be paid back.

115.    Shortly thereafter, in June 2016, the LCB entered the Tacoma facility and ordered that it be shut down and all materials being produced sold off or destroyed. Anderson and Vicioso, who were in New York at this time, worked with the LCB to follow its regulations regarding the

C&F: 3690002.2

winding down of operations. Under the supervision of the LCB, Anderson installed a manager to work with the LCB to sell off and destroy the materials that had been produced. All funds from final sales were applied to state and federal taxes, employee wages, and LCB fines.

116.    Anderson contacted Espegard to ask for advice in responding to the LCB investigation. Espegard's initial response was two-fold: First, he advised that Anderson and Vicioso should cooperate with the LCB, but that before making any submissions to the LCB, they should send them to him first. Second, Espegard essentially played dumb. He wrote that as far as he was aware, there were no financing issues because he understood that Owens paid for the operation of the business and that Owens was running the business prior to Anderson exercising the option. This after-the-fact attempt at an exculpatory email was preposterous.

117.    Anderson provided emails and other information requested to the LCB and continued to seek guidance from Espegard as well as her attorneys at Harris & Moure. In conversations with Vicioso, Espegard took a different approach than in his written emails.

118.    Espegard acknowledged to Vicioso that many of the communications that Anderson could provide to the LCB would not present Espegard or Gordon Thomas Honeywell in a positive light. Espegard also told Vicioso that Vicioso and Anderson faced legal liability for their violations of LCB and Washington state laws and regulations (violations that only occurred because of Espegard's advice). Because of the risks to Espegard, Gordon Thomas Honeywell, and to Anderson and Vicioso, Espegard told Vicioso that he and Anderson should disappear. He told them to go back to New York, to stop responding to inquiries from the LCB, and to delete their email accounts and get new cell phones and new cell phone numbers.

119.    At this point, June 2016, SEO Development had spent – and lost – nearly $2 million, while Anderson and Vicioso had individually spent approximately $800,000 in addition

C&F: 3690002.2

to disrupting their lives and the lives of their children and forgoing Vicioso's medical practice for more than two years – a practice in which he made approximately $500,000 annually. Anderson and Vicioso had been thoroughly defeated financially, professionally, and personally.

120.    They returned to New York to regroup and pick up the pieces of their lives.

121.    Over the next two years, Anderson and Vicioso did just that. Vicioso reestablished his medical practice, and Anderson focused on her other business ventures. While troubled with what had happened to them (but still not aware of the full extent of Espegard's fraud), Anderson and Vicioso determined the best way to deal with the past was to live well moving forward.

122.    Unfortunately, Espegard, Owens, and Gordon Thomas Honeywell had a different philosophy. Instead of being happy to not be sued for fraud and malpractice and move on with life, in June 2018, Lee Owens sued Anderson and Vicioso in Washington state court alleging breach of contract against Anderson and Vicioso and seeking damages for L & D losing its LCB license. In perhaps the most unbelievable aspect of this entire unbelievable case, Owens is represented in that lawsuit by Ryan Espegard of Gordon Thomas Honeywell.

123.    While prior to the Owens lawsuit, Anderson and Vicioso knew it was Espegard's legal advice that had largely led to the LCB shutting down their business, they did not learn the full extent of Espegard's and Owens' fraud until the past few months.

124.    Specifically, after receiving the lawsuit, Vicioso, on behalf of Anderson, filed a grievance against Espegard with the Washington State Bar Association (WSBA). In the response to the grievance, Gordon Thomas Honeywell falsely claimed that (1) Espegard was never Anderson's attorney, and (2) stated that it was never Owens' intention to run the business for any period of time after the final license was granted. This second point is an astounding admission.

C&F: 3690002.2

125.    At all times prior to when the license was acquired in November 2015, Espegard and Owens represented that Owens would run the business until Anderson exercised the option. Espegard and Owens represented this when the deal was first being negotiated in 2014, they represented it when the Option Agreement was executed and then amended later that year – indeed the Option Agreement required that Owens retain full control and manage L & D prior to exercise of the option – and they represented right up until when the LCB issued the final license that Owens would initially manage the business.

126.    But now, in a statement submitted to the WSBA, Gordon Thomas Honeywell and Espegard admit that they always knew this representation was false and that Owens never intended to run the business for any period after obtaining the license. Accordingly, at the time Owens entered into the Option Agreement with Anderson, with Anderson relying upon the terms and representations in that Agreement, Owens had an undisclosed intention not to comply with it.

127.    This also means that when SEO sunk millions of dollars into leasing and developing a facility in which the parties would operate the business in reliance upon the Option Agreement and upon Owens' and Espegard's repeated representations about Owens initially managing the business, Owens and Espegard knew those representations were false and Owens never intended to perform what he had promised to do.

128.    After learning that Espegard's failures went beyond malpractice and extended to fraud, Vicioso decided to reach out to Michael Reid only a few weeks ago. Reid said that he remembered Vicioso and asked why Vicioso had dropped out of contact with Reid. Reid expressed that he thought they had hit it off and were going to make a deal. Vicioso explained that they could not move forward with Reid after they learned from their attorney that Reid had a felony

conviction. Reid was astounded and angry when he heard this. He explained to Vicioso that he is a practicing attorney with a completely clean record.

129.    Only then did Vicioso and Anderson understand how thoroughly they had been defrauded by Espegard, Gordon Thomas Honeywell, and Owens.

130.    In sum, Ryan Espegard latched into Anderson and Vicioso, two young professionals eager to establish a business in an area in which he was one of the few attorneys practicing at the time. He used their trust in him to fraudulently steer them to an existing client of his. He then used the confidential, financial, personal information that they had given to him when he acted as their attorney so that his client, Owens, could leverage a better deal for himself, and so that that they would pay his client's outstanding balance to Gordon Thomas Honeywell. He negotiated for his client and his client executed a contract knowing that the client never intended to perform aspects of that contract that Anderson, Vicioso, and their investment entity SEO relied upon in entering the deal and then investing millions of dollars and years of their lives. When Anderson's interests were aligned with Owens, Espegard again became Anderson's attorney and advised her to take multiple courses of action that violated numerous LCB regulations. After the LCB shut down Anderson's business, Espegard advised Anderson and Vicioso to leave, stop responding to the LCB and to destroy evidence.

131.    Two years later, presumably assuming they had destroyed the evidence, Espegard on behalf of Owens, instituted a lawsuit against Anderson and Vicioso seeking millions of dollars in damages.

132.    Anderson and Vicioso did not destroy evidence as Espegard advised them to. They now bring this action individually and on behalf of SEO seeking to redress Ryan Espegard's, Gordon Thomas Honeywell's, and Lee Owens' gross behavior.

31

### Claims for Relief

### First Claim for Relief
(Fraudulent Misrepresentation – on behalf of Anderson and Vicioso against
Espegard and Gordon Thomas Honeywell)

133.    Plaintiffs reallege and incorporate by reference all prior allegations as if fully set forth herein.

134.    Espegard, individually and as an agent of, and acing with full authority on behalf of, Gordon Thomas Honeywell falsely stated to Vicioso, who was acting individually and on behalf of his wife Anderson, that Michael Reid was a convicted felon, and therefore Reid would not be able to obtain a final LCB license and therefore Anderson and Vicioso could not move forward on a deal to acquire license rights from Reid.

135.    This statement was false, and Espegard knew it to be false.

136.    Espegard made this misrepresentation to induce Anderson and Vicioso to enter into a transaction with Owens.

137.    At the time Espegard, as an agent of, and acting with full authority on behalf of, Gordon Thomas Honeywell, was Anderson's attorney.

138.    Vicioso and Anderson relied upon their attorney's representation, and upon his recommendation to purchase an LCB license from Owens.

139.    Vicioso and Anderson only discovered that Reid was not a convicted felon in or around September 2018.

140.    As a result of Espegard's, and Gordon Thomas Honeywell's misrepresentation, Anderson and Vicioso suffered substantial damages in an amount to be determined at trial, but believed to be in excess of $800,000.

C&F: 3690002.2

Second Claim for Relief
(Fraudulent Inducement – on behalf of all Plaintiffs stated against all Defendants)

141.   Plaintiffs reallege and incorporate by reference all prior allegations as if fully set forth herein.

142.   Owens and Espegard, individually and as an agent of, and acting with full authority on behalf of, Gordon Thomas Honeywell, repeatedly misrepresented that Owens was capable of and would manage L & D for the time period from when the LCB license was issued until Anderson exercised the option.

143.   These representations were made multiple times over the course of 2014 and 2015, including

  a.   In July and August 2014 in emails and telephone calls while negotiating the Option Agreement.

  b.   When Owens executed the Option Agreement in August 2014 and then the Amended Option Agreement in October 2014, which required that Owens manage L & D up until when the option was exercised.

  c.   Throughout 2015 in telephone calls and emails as the parties prepared to operate the business after obtaining the final license.

  d.   Upon information and belief, to the LCB during interviews and phone calls in which the LCB asked Owens and Espegard about how the business would be managed and run after the license was issued.

144.   Anderson relied upon these oral and written representations in entering into the Option Agreement and the Amended Option Agreement.

C&F: 3690002.2

145.    Anderson and Vicioso relied upon these oral and written representations investing substantial sums of money and amounts of time in improving the Tacoma facility and working in good faith to procure the LCB licnese.

146.    Anderson, acting on behalf of SEO, relied upon these written and oral representations in entering into a multi-year lease of a 30,000 square foot facility and spending substantial sums renovating, improving and purchasing equipment for that facility.

147.    Per Espegard's and Gordon Thomas Honeywell's written statement to the WSBA, these representations were false when made and Owens, Espegard, and Gordon Thomas Honeywell knew them to be false.

148.    Defendants made these misrepresentations to induce Plaintiffs to, inter alia, (a) enter into the Option Agreement, (b) pay Owens' outstanding legal fees to Gordon Thomas Honeywell, and (c) invest significant sums of money and invest significant effort into obtaining an LCB license for L & D.

149.    As a result of Defendants' misrepresentations, Plaintiffs have been damaged in an amount to be proved at trial but believed to be in excess of $2 million.

Third Claim for Relief<br>(Fraudulent Omission – on behalf of all Plaintiffs stated against all Defendants)

150.    Plaintiffs reallege and incorporate by reference all prior allegations as if fully set forth herein.

151.    Owens and Espegard, individually and as an agent of, and acting with full authority on behalf of, Gordon Thomas Honeywell, failed to disclose material facts concerning the transactions at issue herein, including, inter alia, that (a) Owens never intended to perform under the Option Agreement, (b) L & D had no assets and no bank accounts and was therefore completely

unable to run any business for any amount of time, and (c) that Owens had essentially no money at all to cover any costs of business operations for any period of time.

152.    These were facts within the exclusive knowledge of Defendants and Defendants had a duty to disclose them to Plaintiffs.

153.    As counsel for Anderson, Espegard and Gordon Thomas Honeywell owed Anderson a fiduciary duty and were required to disclose material facts to her.

154.    Defendants failed to disclose these material facts to Plaintiffs to induce Plaintiffs to, inter alia, (a) enter into the Option Agreement, (b) pay Owens' outstanding legal fees to Gordon Thomas Honeywell, and (c) invest significant sums of money and invest significant effort into obtaining an LCB license for L & D.

155.    As a result of Defendants' fraudulent omissions, Plaintiffs have been damaged in an amount to be proved at trial but believed to be in excess of $2 million.

Fourth Claim for Relief
(Negligent Misrepresentation – on behalf of all Plaintiffs stated against all Defendants)

156.    Plaintiffs reallege and incorporate by reference all prior allegations as if fully set forth herein.

157.    Defendants represented to Plaintiffs that (a) Michael Reid was a convicted felon, (b) that Owens had the ability and intention to manage L & D prior to Anderson's exercise of the option, (c) that Owens had some financial means to finance the initial operations of L & D after it obtained the final license.

158.    Defendants made these representations, which they knew to be false or at a minimum had reason to know were misleading, in order to induce Plaintiffs to, inter alia, (a) enter into the Option Agreement, (b) pay Owens' outstanding legal fees to Gordon Thomas Honeywell,

35

and (c) invest significant sums of money and invest significant effort into obtaining an LCB license for L & D.

159.    Plaintiffs relied on these representations in entering into the transactions complained of herein and in investing millions of dollars and years of their lives.

160.    As a result of Defendants' misrepresentations, Plaintiffs have been damaged in an amount to be proved at trial, but believed to be in excess of $2 million.

<u>Fifth Claim for Relief</u>
(Breach of Fiduciary Duty – on behalf of Anderson stated against
Espegard and Gordon Thomas Honeywell)

161.    Plaintiffs reallege and incorporate by reference all prior allegations as if fully set forth herein.

162.    As counsel for Anderson, Espegard and Gordon Thomas Honeywell owed her a fiduciary duty.

163.    This duty extend to the time period in which Anderson was a former client so that Espegard and Gordon Thomas Honeywell could not use confidential information obtained from Anderson or anyone acting on her behalf in a manner adverse to Anderson.

164.    Espegard and Gordon Thomas Honeywell breached their fiduciary duties to Anderson by, inter alia, (a) steering her to do business with Owens, (b) providing Owens with confidential information obtained from Anderson for Owens to use to his advantage, (c) advising Anderson to violate LCB regulations by taking the Traceability Test and to finance L & D in a manner that was illegal under LCB rules and regulations.

165.    As a result of Espegard's and Gordon Thomas Honeywell's breach of their fiduciary duty, Anderson has been damaged in an amount to be determined at trial but believed to be in excess of $800,000.

C&F: 3690002.2

<u>Sixth Claim for Relief</u>

(Malpractice – on behalf of Anderson stated against Espegard and Gordon Thomas Honeywell)

166.    Plaintiffs reallege and incorporate by reference all prior allegations as if fully set forth herein.

167.    Throughout 2015 and into early 2016, Anderson subjectively understood that Espegard was her attorney.

168.    Anderson's subjective understanding was reasonable under the circumstances.

169.    Espegard and Gordon Thomas Honeywell acted negligently and without ordinary care insofar as they advised Anderson to enter into a transaction with Owens instead of Michael Reid, and to take multiple courses of action that violated multiple LCB regulations, including, inter alia, financing regulations and license management regulations, which ultimately resulted in the LCB shutting down Anderson's business.

170.    In providing said advice, Espegard and Gordon Thomas Honeywell failed to act with the requisite standard of care expected of attorneys practicing law in the State of Washington.

171.    Espegard and Gordon Thomas Honeywell, additionally, committed malpractice per se when Espegard, individually and as an agent of, and acting with full authority on behalf of Gordon Thomas Honeywell, disclosed Anderson's sensitive and confidential information to Owens thereby breaching ethical cannons, which are designed to specifically prevent the type of harm that Anderson ultimately suffered.

172.    As a result of Espegard's and Gordon Thomas Honeywell's negligence and malpractice per se, Anderson has suffered damages in an amount to be determined at trial, but believed to be in excess of $800,000.

37

WHEREFORE, Plaintiffs pray for (a) judgment on all claims in an amount to be determined at trial, but believed to be in excess of $2 million, plus statutory interest, (b) punitive damages awarded against Defendants for their willful and malicious conduct, and (c) attorneys' fees, costs and disbursement, and such other further and different relief as the Court deems just and proper.

Dated: White Plains, New York
      October 19, 2018

**CULTIVA LAW PLLC**
Attorneys for Plaintiff
1000 Second Ave, Suite 3900
Seattle, WA 98104
(206) 480-1600

By:   /s/
      Aaron A. Pelley


(Pro Hac Vice Application To Be Filed)
**CUDDY & FEDER LLP**
Attorneys for Plaintiff
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
(914) 761-1300

By:   /s/
      Andrew P. Schriever
      Brendan M. Goodhouse
      Troy D. Lipp

C&F: 3690002.2